IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>)<br>v.                                                                )<br>)<br>ROBERT SCOTT MATTINGLEY              )<br>) | Case No. 6:15-CR-00005 |

**RESPONSE IN OPPOSITION TO MOTION FOR COMPASSIONATE RELEASE**

The government opposes Defendant Robert Scott Mattingley's third Motion for Compassionate Release in which he seeks release due to the COVID-19 pandemic. The Court denied Mattingley's first Motion for Compassionate Release, finding he had not established extraordinary and compelling circumstances based on his health. Now, Mattingley argues those same health issues in conjunction with the COVID-19 pandemic create extraordinary and compelling circumstances for his release. Although Mattingley's health makes him higher risk under the Center for Disease Controls' risk factors, Federal Medical Center (FMC) Devens, where Mattingley is located, has had minimal exposure to the virus, and it is unlikely that Mattingley will contract it. Most importantly, the factors under 18 U.S.C. § 3553(a), which the Court must consider, weigh heavily against Mattingley's early release. Moreover, he has no approved home plan, nor has he offered any transportation plan from Ayer, Massachusetts, to Lynchburg, Virginia. For these reasons, the Court should deny this request for a sentence reduction and compassionate release.

**BACKGROUND**

The government's first brief in opposition to Mattingley's release sets forth the long and

important factual and procedural history of his case. ECF No. 126. In summary, Mattingley was indicted for eleven counts of fraud on April 2, 2015, and he pled guilty to one count of securities fraud on December 1, 2016, pursuant to a plea agreement. ECF Nos. 3, 55. Mattingley's fraud scheme began in 2008 and continued through his indictment, after he pled guilty, and after being sentenced by this Court in 2018. ECF No. 81. In total, he defrauded 80 members of this community out of $865,452.26. ECF No. 84. While continuing to defraud victims after pleading guilty, Mattingley then tried to keep his victims from testifying against him at his sentencing. Sentencing Tr. 14:11–14. Mattingley has shown little remorse for his actions. *Id.* ("I'm afraid from his actions even today, I'm not impressed—you have no respect for people.").

Mattingley's health problems, which all stem from his diabetes, are not new. During Mattingley's prosecution and incarceration, he continually used his health to delay and avoid serving his sentence. "[I]n certain instances, [Mattingley even used] his illness to try to stave off the angry conversations that his victims wanted to have with him at various times." *Id.* 22:6–8. Since his incarceration, he has filed numerous lawsuits and requests for reduction in sentence, all related to his health.

Mattingley now seeks release "based entirely on his comorbidities for COVID-19." ECF No. 139. Mattingley's projected release date is September 15, 2021. The U.S. Probation Office has not reviewed or approved a home plan for Mattingley, and his Motions provide no actual plan— or transportation—other than a brief reference to living at home in Lynchburg with his wife. ECF No. 119 at 10. Similarly he provides no transportation plan describing how he will get from Eastern Massachusetts to Lynchburg, Virginia.

Considering all of the relevant factors, the United States opposes Mattingley's release.

## BOP RESPONSE TO COVID-19 OUTBREAK

Mattingley is currently detained in FMC Devens, "[a]n administrative security federal medical center" in Ayer, Massachusetts. U.S. Bureau of Prisons, *FMC Devens*, https://www.bop.gov/locations/institutions/dev/ (last visited May 4, 2020).

### I.     BOP's Actions to Protect Inmates from COVID-19

BOP has been planning for potential coronavirus transmissions since January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the CDC, including by reviewing guidance from the World Health Organization. BOP has taken aggressive steps to protect inmates' health and keep COVID-19 outside of its facilities.

In mid-March, BOP implemented an action plan to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff. U.S. Bureau of Prisons, COVID-19 Action Plan: Agency-Wide Modified Operations (Mar. 13, 2020) ("BOP Action Plan"), *available at* www.bop.gov/resources/news/20200313_covid-19.jsp (last visited May 4, 2020). This Action Plan involved (1) screening of inmates and staff; (2) establishment of quarantine areas within facilities; (3) suspension of social visits and tours; (4) suspension of legal visits; (5) suspension of inmate movements; and (6) modification of operations to maximize social distancing.

On March 31, 2020, BOP announced "Phase Five" of its COVID-19 response "[i]n response to a growing number of quarantine and isolation cases in our facilities." https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited May 4, 2020). The "Phase Five" announcement states as follows:

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

3

- In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.

- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

The "Phase Five" plan went into effect April 1, 2020. *Id.*

Additionally, BOP has issued cloth face masks to all inmates and staff, common areas are sanitized multiple times a day, and cells can be cleaned at least once a day. *See* U.S. Bureau of Prisons, *Correcting Myths and Misinformation About BOP and COVID-19*, *available at* https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf. Specifically at FMC Devens, the institution has implemented numerous procedures and protocols to minimize the spread of COVID-19. *See* Shaw Decl., *Grinis v. Spaulding*, No. 1:20-cv-10738, ECF No. 32-1 (D. Mass. Apr. 22, 2020), attached as Exhibit 1.

Additionally, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. Mem. from Attorney General to BOP Dir. (Mar. 26, 2020), *available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/aghome.pdf. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security

Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this greater discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. Mem. from Attorney General to BOP Dir. (Apr. 3, 2020), *available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/agcovid2.pdf. He further clarified his directive should be implemented immediately and "should include all at-risk inmates-not only those who were previously eligible for transfer." *Id*.

BOP is devoting all available resources to executing the directive from the Attorney General. As of this filing, BOP has transferred 1,972 inmates to home confinement. U.S. Bureau of Prisons, *COVID-19 Home Confinement Information*, https://www.bop.gov/coronavirus/ (last visited May 4, 2020). BOP professionals continue to monitor this situation and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained under judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live

5

and access to health care in these difficult times. And it must consider a myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II. Mattingley Is Not Appropriate for Release Through BOP's Prioritization Program

Mattingley is not currently identified on his institution's list of inmates eligible for home confinement under BOP's program. FMC Devens currently has only one confirmed case of COVID-19 among inmates, and none among staff. U.S. Bureau of Prisons, *COVID-19 Cases*, www.bop.gov/coronavirus/ (last visited May 4, 2020). FMC Devens isolates prisoners presenting symptoms of COVID-19. *See* Shaw Decl., Ex. 1. The presence of COVID-19 at FMC Devens may increase Mattingley's risk of contracting the disease, but, as discussed below, release on home confinement would present its own risks. BOP gave and will continue to give serious consideration to Mattingley's risk of exposure to coronavirus and illness from COVID-19 as part of the priority home confinement program. If he cannot obtain home confinement under BOP's priority program or through the administrative remedies process, he is likely not a suitable candidate for compassionate release.

## ARGUMENT

## I. Compassionate Release Legal Framework

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides, in part, that the "court may not modify a term of imprisonment once it has been imposed except that . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and

compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The Sentencing Guidelines policy statement appears at § 1B1.13 and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The relevant portions are:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.— . . .
>     (ii) The defendant is—
>         (I) suffering from a serious physical or medical condition,
>         (II) suffering from a serious functional or cognitive impairment, or
>         (III) experiencing deteriorating physical or mental health because of the aging process,
>     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the

7

>>aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>>. . . .
>>(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

For its part, consistent with note 1(D), BOP promulgated Program Statement 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf, to set forth its evaluation criteria.

In general, the defendant has the burden to show the "rare" and "extraordinary" circumstances meeting the test for compassionate release. *See United States v. Brewington*, 2019 WL 3317972, at *2 (W.D. Va. July 24, 2019) (Jones, J.);[1] *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019); *United States v. Gutierrez*, 2019 WL1472320, at *2 (D.N.M. Apr. 3, 2019).

### A. Mattingley's Health Does Not Create Exceptional and Compelling Circumstances Warranting a Sentencing Reduction

Mattingley argues he "has a particularized susceptibility to COVID-19" creating exceptional and compelling circumstances warranting his release. Mot. at 3, ECF No. 141. In determining what constitutes "extraordinary and compelling reasons," courts have considered related policy statements under the United States Sentencing Guidelines. *See, e.g., United States v. Beck*, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) (considering what the Sentencing Guidelines defined as "extraordinary and compelling reasons"). These policy statements provide medical conditions can, alone, prove sufficiently extraordinary and compelling to justify a sentence modification. U.S.S.G. § 1B1.13, application note 1(A)-(B), (D). To be extraordinary and

---

[1] Internal quotation marks and citations omitted throughout.

compelling, however, an inmate must be suffering from "a terminal illness," that is, "a serious and advanced illness with an end of life trajectory," which Mattingley does not assert, or from a "serious physical or medical condition" serious enough that it "substantially diminishes the ability of the [inmate] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, n. 1(A)(i) and (A)(ii)(I).[2] As set forth in the government's previous filing and the Court's previous ruling, Mattingley is capable of self-care. *See* Gov't's Resp. in Opp. at 14, ECF No. 126; Op. at 10, ECF No. 135.

The government acknowledges that COVID-19 may affect whether Mattingley can show an "extraordinary and compelling reason" warranting compassionate release under § 3582(c)(1(A)(i), but only to the extent he (1) has a condition or characteristic that is a cognizable basis for compassionate release under the current criteria and that condition or characteristic also elevates the inmate's risk of becoming seriously ill from COVID-19 under the CDC guidelines, and (2) he is more likely to contract COVID-19 in his particular institution than if released. Although Mattingley may be high-risk, FMC Devens has taken many precautions and has only seen one case of COVID-19, which they have been able to contain, and has not spread to any other inmates or staff. Mattingley argues that he will likely be exposed to the virus if he leaves FMC Devens to get medical treatment. Mot. at 4, ECF No. 141. But being released from FMC Devens would require him to seek extensive medical treatment in the community where he has a likelihood of exposure, whereas at FMC Devens, much of his medical care can be provided onsite. Further, without providing any detailed release plan, let alone one verified and approved by the U.S. Probation Office, it is unclear whether his wife is currently working outside the home, thereby increasing Mattingley's potential exposure, and whether anyone else would be living with him in

---

[2] There are other reasons unrelated to Mattingley's claims, which the government does not address herein. *See* U.S.S.G. § 1B1.13, n.1(A)(ii)(I), (A)(II), (A)(III), (B), (C)(i), (C)(ii), and (D).

the home. Thus, it is not more likely that Mattingely would contract COVID-19 at FMC Devens than if released. Therefore, Mattingley cannot meet his burden to establish his entitlement to a sentence reduction on that ground alone.

### B. The § 3553(a) Factors Weigh Against a Sentencing Reduction

If the Court were to find extraordinary and compelling reasons warranting a sentencing reduction, it would be required to "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
>>
>>> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>>
>>> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
>>
>> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing

> Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
>
> (5) any pertinent policy statement--
>
>> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>
>> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

These factors weigh against Mattingley's release here. First, the nature and circumstances of the offense weigh against release. "Defendant has committed serious fraud and financial crimes. He continued to commit crimes while . . . on supervised release. . . . Under the circumstances, reducing defendant's term of imprisonment would not promote respect for the law or provide just punishment." *United States v. Hill*, 2020 WL 205515, at *2 (E.D.N.C. Jan. 13, 2020). Between 2008 and 2018, Mattingley stole large amounts of money from many people. He continued his fraudulent scheme during the pendency of his criminal case until he was incarcerated. These nature and circumstances weigh against release.

Second, Mattingley owes significant restitution in this case, and he has made no effort to pay it. Mattingley owes $865,452.26 in restitution to eighty victims. ECF No. 81. While incarcerated, Mattingley has not made any meaningful payments toward his restitution. Between

his sentencing and supervised release revocation, Mattingley only paid his $100 special assessment and did not make any restitution payments. *See* Consolidated Debt Collection System, Ex. 2. While incarcerated, Mattingley made three $25.00 payments through BOP.[3] *Id.* In December 2019, Mattingley refused to continue in the financial responsibility program at BOP, which provides quarterly restitution payments from prison wages. ECF No. 141-1. In Mattingley's numerous filings seeking release, he makes no mention of his restitution and how he plans to make meaningful payments upon his release. This great need to provide extensive restitution to numerous victims weighs heavily against Mattingley's release.

The United States further notes that although Mattingley's brief asserts he has "a verifiable release plan with his wife," ECF No. 141 at 2, his filings provide no description of that plan, and no plan has been evaluated by the U.S. Probation Office to determine its appropriateness. Mattingley discusses his need for medical treatment, but provides no plan for how he would receive treatment in Lynchburg other than his wife "help[ing] with transportation to the doctor." ECF No. 119 at 7. Further, the "plan" makes no mention of whether his wife is working, how that would impact her ability to assist him in transportation, and whether he has anyone else to support him. This information is also important to understand the increased risk of exposure Mattingley would have if he were to be released.

Notably, his filings for release also make no mention of a 14-day quarantine period to protect the public if Mattingley has been exposed to COVID-19.[4] Also glaringly absent is any transportation plan as to how Mattingely intends to travel from FMC Devens to Lynchburg,

---

[3] The Treasury Offset Program initially captured Mattingley's 2019 tax return. However, this debt was not eligible for the Treasury Offset Program and that payment was reversed and returned, as shown on the first and third lines. Ex. 2.

[4] If the Court determines that Mattingley warrants release, the government requests the Court order a 14-day quarantine of Mattingley to minimize any risk to the public.

Virginia—a distance of 611 miles. Therefore, Mattingley's proposed home plan has several flaws and it has not been evaluated by the U.S. Probation Office.

## II.  This Court Has No Authority to Direct BOP to Place Mattingley in Home Confinement.

Mattingley has also asked "[t]he remaining portion of his custodial sentence should be converted to home confinement during his supervised release." ECF No. 139 at 6. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Serafini*, 233 F.3d 758, 778 n.23 (3d Cir. 2000); *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993); *Glowka v. Zeigler*, 2014 WL 27087, at *3 (S.D.W. Va. Jan. 6, 2014). Because Mattingley's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny such a request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("[T]he Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of a sentence, the Court has limited jurisdiction to correct or

13

modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Mann*, 435 F. App'x 254, 255 (4th Cir. 2011) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* 18 U.S.C. § 3582(c). But Mattingley's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Mattingley's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because Mattingley offers no statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[5]

## CONCLUSION

In summary, the Court should deny Mattingley's motion for compassionate release because his low risk of contracting COVID-19 at FMC Devens does not create extraordinary and compelling circumstances justifying a reduction in sentence. In addition, the § 3553(a) factors weigh against his release, he does not have a sufficient home or transportation plan, and the court lacks authority to order Mattingley to serve the remainder of his sentence on home confinement. For the foregoing reasons, the Government respectfully requests the Court deny Mattingley's request Motion for Compassionate Release.

---

[5] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." U.S.S.G. § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with U.S.S.G. § 5F1.2. *See* 18 U.S.C. § 3583(e)(2).

Respectfully submitted,

THOMAS T. CULLEN
United States Attorney

Date: May 4, 2020                                                  */s/ Krista Consiglio Frith*
                                                                   Krista Consiglio Frith
                                                                   Virginia State Bar No. 89088
                                                                   Assistant United States Attorney
                                                                   Western District of Virginia
                                                                   Post Office Box 1709
                                                                   Roanoke, Virginia 24008-1709
                                                                   Telephone: (540) 857-2250
                                                                   E-mail: Krista.frith@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2020, I caused a true copy of the foregoing Response to Defendant's Motion for Compassionate Release to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to all counsel of record.

*/s/ Krista Consiglio Frith*
Krista Consiglio Frith
Assistant United States Attorney