**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 6:15CR00005** |
| | **)** | |
| **ROBERT SCOTT MATTINGLEY** | **)** | **Hon. Norman K. Moon** |

### REPLY IN SUPPORT OF COMPASSIONATE RELEASE MOTION

The Government's opposition can be summarized in five points. First, that Mr. Mattingley has not presented a home plan, or transportation plan. Second, that Mr. Mattingley is "unlikely" to contract COVID-19 at FMC Devens. Third, that because he has not been released through the CARES Act, this court should not release him. Fourth, that this Court does not have the authority to place him in home confinement. Fifth, that the § 3553 factors weigh against release because he has not been paying his restitution. All of these concerns are addressed here.

### I.    Mr. Mattingley's Home Plan and Transportation Plan

Mr. Mattingley's wife, Patty Mattingley, is currently employed full-time but is working remotely due to COVID-19. As a result, she is in the perfect position to be able to monitor his health conditions and transport him to his physicians at Centra Health, Lynchburg Family Physicians, UVA, Central Medical Group Urology, Centra Medical Group Physical Therapy and Pain Management. The government correctly notes that Mr. Mattingley's chronic health concerns pre-date his incarceration, which means he already has a network of care providers that have established relationships with him. If Ms. Mattingly is unable to transport

him for any reason, his adult son and daughter who both live in Lynchburg are also able to assist.

What is more, United States Probation Officer Sean Sweeney visited Mr. Mattingley's residence in January of 2019 – the same residence he lived at while on bond – in connection with a prior compassionate release motion. And the residence was approved for release then. Nothing has changed.

Mr. Mattingley's wife will personally drive to FMC Devens to pick him up if the Court releases him.

## II.   Mr. Mattingley is More Likely to Contract COVID-19 at FMC Devens Than if He was Released

The government's position on COVID-19 in the Bureau of Prisons is summed up this way: "Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead." Gov't Opp. at p. 5. This chart shows the number of active (non-recovered) COVD-19 cases in the Bureau of Prisons by day since the first reported case. It is certainly unfortunate and inevitable that more and more inmates are going to get COVID-19 while



incarcerated, but it is not inevitable that Mr. Mattingley be one of them. The best evidence that the BOP cannot control the spread of COVID-19 is that the BOP has utterly failed to control the spread of COVID-19 thus far. The BOP first began issuing medical and screening guidance in January and February 2020, instituted a

nationwide lockdown on March 24th, instituting the enhanced procedures and protocols described in the Government's Exhibit 1 in mid-March, but the BOP's self-reported numbers show a steeply rising curve and likely significantly undercount the reality.

This Court should not bet Mr. Mattingley's safety on the fact that FMC Devens has had only one reported case to date.  Testing at BOP facilities has varied widely, and BOP acknowledges that some facilities are simply not testing for COVID-19.[1]  That means that any facility that self-reports few, or zero cases may simply not be testing for the virus. *See United States v. Asaro*, 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020) (noting that, where there are no reported cases in a facility, "absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility," and emphasizing that "[t]he virus is spreading" in the state where the federal prison is located).  Upon information and belief, FMC Devens has reported one case because that inmate tested positive not at FMC Devens, but at an outside hospital.  That inmate has since died from the virus.

Second, all of the BOP facilities where people are sick, dead, or dying started out with zero reported cases—and the situation turned deadly quickly. To Mr.

---

[1] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020), https://bit.ly/34Az7tf; *see also* Cary Aspinwall & Joseph Neff, *These Prisons Are Doing Mass testing for COVID-19—And Finding Mass Infections*, The Marshall Project (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections ("Federal officials have largely given up testing at a half dozen prisons . . . .").

Mattingley's knowledge, FMC Devens has not been actively testing inmates for COVID-19, and the government has failed to provide any proof, by way of a declaration from the BOP, that FCI-Devens is actively testing and that there are genuinely no remaining cases there.

Not only would a failure to test explain FMC Devens' lack of positive cases, but it would be consistent with the BOP's modus operandi around the country. In at least one facility, the BOP has declared all inmates presumptively infected, stopped testing altogether, and is refusing to release infection estimates.[2]  In another, the president of the correctional officers' union estimates inmate infection at 600% of BOP's public numbers.[3] One BOP employee told news reporters that "the Bureau is playing with these numbers . . . , if they don't test 'em and they don't get confirmed they don't have to be reported."[4] As an example, only nineteen people out of the combined 2,400 people incarcerated at the Metropolitan Detention Center and

---

[2] Nicholas Chrastil, *supra* note 5 ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").
[3] Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020), https://bit.ly/2VtyPAv. At FCI-Elkton, the BOP reported much lower numbers in its official count than those inside the prison. The BOP reported just 10 inmate  infections, while the correctional union president said management inside the prison provided strikingly higher numbers: 67 positive or symptomatic and isolated, 44 hospitalized, 14 on ventilators, 12 staff infected, and three dead. *Id.*
[4] Chrastil, *supra* note 2; Walter Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#719057947ba3 (quoting BOP spokesperson Sue Allison, who confirmed that the BOP's reporting "does not necessarily account for unconfirmed (non-tested) cases.").

Metropolitan Correctional Center in New York City had been tested as of April 23.[5] Senators Dick Durbin (D-IL) and Chuck Grassley (R-IA) have publicly questioned whether the BOP's numbers are accurate and whether the BOP is downplaying the threat of COVID-19 behind bars.[6]

Testing matters. Out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 came back positive—roughly 70%.[7]  If this figure is generalizable to the broader population in the BOP's care, all of those people are in grave danger. We should not feel comforted by a facility reporting zero cases if that facility is not testing any of the people in its care.

Moreover, because of how quickly COVID-19 spreads in a prison environment, facilities with zero cases can become deadly hotspots within a matter of days or weeks. For example, on April 3, the government opposed release in another case in this district, for an inmate at FCI–Butner, citing all of the same BOP COVID-19 policies, such as screening, visitation lockdown, and social distancing, as being sufficient to prevent the spread of COVID-19 within Butner. *See United States v. Rumley*, No. 08-cr-5, Dkt. 185, at 4–7 (W.D. Va. Apr. 3, 2020). As of April 1, 2020, there were just 9 confirmed inmate cases of COVID-19 across

---

[5] Andrew Cohen, *Federal Prisons Told Inmates They Were Coming Home Because of COVID-19. Then They Took It Back*, Slate (Apr. 28, 2020), https://slate.com/news-and-politics/2020/04/federal-prisons-reverse-covid-19-releases-william-barr.html.
[6] Letter from Senators Durbin & Grassley to Inspector General Michael Horowitz (Apr. 21, 2020), https://www.durbin.senate.gov/imo/media/doc/DOJ%20IG%20COVID-19%20BOP%20letter%20final%20signed.pdf.
[7] Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, Associated Press (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

the multiple Butner facilities.  By April 14th, four incarcerated people had died and 45 were confirmed infected.[8]  By May 4, six incarcerated people had died and 210 were confirmed infected.[13]  And, despite the BOP's "precautions," the virus has infected Butner's medical center, which houses extremely medically vulnerable inmates like Mr. Mattingley.[9]  And the inmate in question, Mr. Rumley, has now tested positive for COVID-19. *See Rumley*, No. 08-cr-5, Dkt. 202.

FCI-Terminal Island is another example of this troubling phenomenon of rosy prognostications followed by a facility plunging into illness and death. As of April 13, 2020, that prison reported seven positive cases among its incarcerated population and two positive staff cases.[10] As of May 4, 2020, those numbers have exploded—623 prisoners have tested positive, and five have died. Fourteen staff members have tested positive as well. Similar outbreaks have occurred at federal prisons in Elkton, Oakdale, and Fort Worth.[11] Even the Metropolitan Correctional

---

[8] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (archived copy, Apr. 14, 2020), https://web.archive.org/web/20200415200817/https://www.bop.gov/coronavirus/index.jsp.

[9] *Id.*

[10] *Id.*

[11] *See, e.g.*, Debbie Holmes, *After Six COVID-19 Deaths, Judge Orders Elkton Prison to Transfer At-Risk Inmates*, WOSU Radio (Apr. 22, 2020), https://radio.wosu.org/post/after-six-covid-19-deaths-judge-orders-elkton-prison-transfer-risk-inmates#stream/0 (discussing Elkton); Sadie Gurman, et al., *Coronavirus Puts a Prison Under Siege*, Wall Street Journal, (Apr. 6, 2020), https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030 (discussing Oakdale); Scott Gordon, *COVID-19 Cases Nearly Quadruple Inside Fort Worth Federal Medical Prison*, NBC DFW (Apr. 23, 2020), https://www.nbcdfw.com/news/coronavirus/covid-19-cases-quadruple-to-132-at-fort-worth-federal-prison/2356912/ (discussing Fort Worth); Mitchell McCluskey et al., *A North Carolina prison complex has 60 inmates and 23 staff members with coronavirus*, CNN (Apr. 12, 2020), cnn.com/2020/04/12/us/butner-prison-

Center in Chicago has not been immune—despite optimism in late March that a defendant at the MCC was safe because "Defendant has failed to cite to any evidence that Covid-19 is in the area within the facility within which he is currently housed."[12] As of May 4, 2020, 98 detainees at the MCC have tested positive, along with 21 staff members.[13]

It bears repeating that COVID-19 is already in FMC Devens' community—meaning it is only a matter of time before a guard or other staff carries it into the facility, in the event that has not already happened. At the time of his last motion one week ago, there were 13,416 confirmed cases in Middlesex County, Massachusetts. As of yesterday, there were 15,980.[14] It makes little sense to wait for an outbreak before releasing Mr. Mattingley, who is at great risk, and who has a confirmed release plan, and who the BOP has categorized as having the lowest possible risk of recidivism. *See* BOP Records attached to dkt # 141-1 at p. 3.

This Court should not put its faith in the BOP's action plan. Comparing the situation in BOP facilities to what is happening in the rest of the country only puts the crisis into starker relief. In BOP facilities, there are 12.84 COVID-19 infections

_____

coronavirus-cases/index.html. Just last Friday, an outbreak of COVID-19 cases at the Federal Medical Center in Lexington, Kentucky "led to a sharp increase" in the area's COVID-19 cases, "when the city had settled into a period of relatively few new cases." Daniel Desrochers, *Outbreak of COVID-19 reported at Federal Medical Center in Lexington: 33 inmates positive*, Lexington Herald-Leader (May 1, 2020), https://www.kentucky.com/news/coronavirus/article242449731.html.

[12] *United States v. Price*, 18-CR-597, Dkt. 70 (Mar. 23, 2020) (Kendall, J.) (denying defendant's motion for pretrial release).

[13] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp.

[14] https://www.mass.gov/doc/covid-19-dashboard-may-5-2020/download

per 1000 people—as compared with 3.51 infections per 1000 people in the broader

United States.[15]  This difference is not surprising, given the BOP's haphazard

approach to testing. As the Washington Post recently noted: "In early March, after

numerous warning[s] from public health officials about the virus in jails and

prisons, federal prosecutors were arguing in court filings that prisoners were more

protected from covid-19 inside a prison than out. A few weeks later, the Federal

Bureau of Prisons put out a statement boasting that only 10 inmates had tested

positive. But that's because the agency wasn't testing."[16] Without widespread

testing, the BOP can do little more than screen for symptomatic coronavirus

carriers, mask and isolate any they find, and bar visitors.[17]

Moreover, the BOP has failed to consistently follow its own "Action Plan."

Staff who should be quarantined after exposure are not.[18] Prisons are failing to

stock basic essentials like soap.[19] The situation is so dire that a union representing

30,000 BOP employees has filed an OSHA complaint because "staff who were

---

[15] *BOP-Reported Positive Tests for COVID-19 Nationwide*, Federal Defenders of New York (last visited May 4, 2020), https://federaldefendersny.org/.

[16] Radley Balko, *Stopping covid-19 behind bars was an achievable moral imperative. We failed.*, Washington Post (May 1, 2020), https://www.washingtonpost.com/opinions/2020/05/01/stopping-covid-19-behind-bars-was-an-achievable-moral-imperative-we-failed/.

[17] *See* Bureau of Prisons, *BOP Implementing Modified Operations*, https://bit.ly/2XzmsFt.

[18] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus*, The Marshall Project (Apr. 3, 2020), https://bit.ly/2VkWuTC.

[19] *See* Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020), https://on.wsj.com/3a4TD6K)

screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[20] Significantly, that complaint names FMC Devens as one of the many sites of "alleged safety or health hazards."[21] This undermines the government's assurances that BOP professionals are in the best position to balance the concerns over the pandemic crisis and the impacts on society if an individual offender is released.  Gov't Opp. at pp. 5-6.

### III.   The Fact that FMC Devens Has Not Released Mr. Mattingly to Home Confinement Under the CARES Act is Not Relevant to this Compassionate Release Motion

The government is incorrect to merge the BOP's consideration of inmates for early release on home confinement under the CARES Act with the relevant standard this Court must look to for this compassionate release motion.  The appropriate analysis is the one that has already been adopted in this district: "In the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Harper*, No. 7:18-cr-25, dkt # 64 (W.D. Va. April 28, 2020) citing *United States v. Feiling*, Criminal No. 3:19cr112 (DJN), 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020); *United States v. Dungee*, Case No. 7:15CR00005, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020).

---

[20] Council of Prison Workers 33, Imminent Danger Report, at 3 (Mar. 31, 2020), https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national- complaint.pdf; *see also* Lia Russell, *Union warns of coronavirus exposure in federal prisons, VA facilities* (Apr. 7, 2020), https://bit.ly/3a5r3C9
[21] Council of Prison Workers 33, Imminent Danger Report, *supra* note 20 at 5

As set forth in Mr. Mattingley's motion, he has a particularized susceptibility to the disease.  At the simplest level, putting aside his numerous other medical complications, the consensus is unequivocal: both diabetes and hypertension, particularly when coupled with age and other health conditions, greatly increase the complications from COVID-19.[22]  The government's casual disregard of his very legitimate predispositions and health issues as "all stem[ming] from his diabetes" and as "not new" does not change the scientific consensus that he is at risk.  Neither does the fact that he has previously advocated for himself through lawsuits and prior requests for reduction in his sentence related to his health change the risk he faces now.  Further, as set forth above, he has a particularized risk of contracting the disease if he remains at FMC Devens.  He therefore meets the requirements for extraordinary and compelling reasons for compassionate release.

---

[22] *See, e.g.*, Zuntou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases From the Chinese Center for Disease Control and Prevention*, JAMA (Feb. 24, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762130 (finding elevated case fatality rates in COVID-19 patients with diabetes and hypertension); Ranganath Muniyappa and Sriram Gubbi, *COVID-19 pandemic, coronagiruses, and diabetes mellitus*, Am. J. Physiology: Endocrinology and Metabolism 318 (Mar. 31, 2020), https://journals.physiology.org/doi/pdf/10.1152/ajpendo.00124.2020 (finding that "[i]ndividuals with diabetes mellitus (DM), hypertension, and severe obesity (BMI 40 kg/m2) are more likely to be infected and are at a higher risk for complications and death from COVID-19") (citations omitted); *see also* Safiya Richardson, et al. *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184 (finding that of the 5700 patients with COVID-19 studied in New York, those with diabetes were more likely to need invasive intubation).

To the extent this Court considers the BOP's present failure to release Mr. Mattingley on home confinement as even relevant to this question, it should not be persuasive.  Contrary to the government's argument, the BOP is not maximizing its tools to reduce population density in its facilities, which is essential to managing the crisis.[23]  Despite memoranda from Attorney General William Barr ordering the BOP to "immediately maximize" home confinement,[24] the BOP reportedly has only transferred 1,972 people nationwide to home confinement since March 26.[25]  That is about 1 percent "of the more than 174,000 people in the bureau's custody at the start of [April], according to data obtained from the agency and Congress."[26]  In spite of the government's claims that the BOP is "actively reviewing" home confinement requests like Mr. Mattingley's, the reality on the ground is that the BOP's implementation of Attorney General Barr's directive has been chaotic at best.  The population numbers from FMC Devens confirm that few, if any, prisoners have been released early to home confinement.

---

[23] "Lower inmate density means less spread. Therefore, population reduction is essential to managing this crisis." John Wentzel, *What We've Learned About COVID-19 in Prisons*, Real Clear Politics (May 3, 2020), https://www.realclearpolitics.com/articles/2020/05/03/what_weve_learned_about_covid-19_in_prisons.html.

[24] William Barr, Memorandum for Director of Bureau of Prisons (Apr. 3, 2020), https://www.justice.gov/file/1266661/download

[25] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp.

[26] Joseph Neff & Keri Blakinger, *Few Federal Prisoners Released Under COVID-19 Emergency Policies*, The Marshall Project (Apr. 25, 2020), https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies

| Date | Camp | FMC |
|------|------|-----|
| April 9 | 108 | 914 |
| April 16 | 108 | 906 |
| April 23 | 106 | 905 |
| April 30 | 105 | 902 |
| May 6 | 105 | 902 |

As an initial matter, the BOP has sent conflicting signals about who is eligible for release on home confinement. The BOP initially said it "would consider early release for a wide range of prisoners, even those who had served less than half the length of their sentences."[27] Then, this policy was changed—without notice—to limit eligibility for early release to those who had served *at least* half of their sentence.[28] That policy was then reversed *yet again* to allow anyone to be considered, as long as they meet other criteria.[29]

Second, the BOP's back-and-forth has resulted in stalled transfers and heartbreak for incarcerated people and their families. Transfers may only take place after the person completes a 14-day "quarantine." *United States v. Scparta*, 2020 WL 1910481, at *2–*3 (S.D.N.Y. Apr. 20, 2020). Not only are those approved for transfer not immediately quarantined, but these "quarantines" are often anything but. Families of incarcerated people have reported that their "loved ones approved for home confinement [were] placed in the same special housing unit as

---

[27] Cohen, *supra* note 5.
[28] *Id.*
[29] *Id.*; *see also* Andre Matevousian, BOP Memorandum Regarding Home Confinement, https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf.

people isolated due to [COVID-19] symptoms."[30] A federal judge called FCI-Butner's 14-day, prerelease "quarantine" process "neither a quarantine nor limited to 14 days" because the 14-day clock restarts for everyone if one person tests positive. *Scparta*, 2020 WL 1910481, at *1; *see also United States v. Thompson*, No. 15-CR-448, Dkt. 81 (N.D. Ill. Apr. 20, 2020) (defense filing describing "quarantine" conditions at Butner). In fact, undersigned counsel and the government recently witnessed this frustrating process in action in another case where BOP moved the finish line in exactly this way, and the Chief of the Criminal Division of the U.S. Attorney's Office ultimately had to step in to ensure that it wasn't moved again. *Thompson*, Dkt. 82 (N.D. Ill. Apr. 29, 2020). This approach runs counter to the Attorney General's directive, which explicitly authorizes the BOP to permit people to self-quarantine *at home*.[31]

Those who make it through the BOP's faux quarantine process are the lucky ones. Some families report that loved ones sent to pre-release "quarantine" are sent back to the general population with their release date revoked.[32] One woman drove from another state to pick up her husband at FCI-Oakdale after she was told he would be released. Upon her arrival, she was informed that he would not be released since he had not yet served half of his sentence. A judge intervened to

---

[30] Liliana Segura, *As Virus Spreads in Federal Prisons, People Inside Describe Chaos, While Families are Left in the Dark*, The Intercept (Apr. 15, 2020), https://theintercept.com/2020/04/15/federal-prisons-coronavirus/.
[31] *Id.*
[32] Segura, *supra* note 30.

order his release, but in spite of the judge's order, the BOP still refused to release her husband, claiming that the "judge's order was unclear."[33]

These reports describe an agency in crisis, not one that is following its "Action Plan" or the Attorney General's directives. Many judges across the country have highlighted the BOP's COVID-19 crisis in their decisions to grant compassionate release. *See United States v. Hammond*, 2020 WL 1891980, at *9 (D.D.C. Apr. 16, 2020) (responding to the government's argument that "BOP is prepared to deal with pandemics such as the coronavirus" by noting the hundreds of positive cases and sixteen inmate deaths that resulted "[d]espite the precautions taken by BOP"); *Scparta*, 2020 WL 1910481, at *1 (noting the "dangerous set of conditions and Kafkaesque [quarantine] approach" employed at Butner); *United States v. Sanchez*, 2020 WL 1933815, at *2 (D. Conn. Apr. 22, 2020) (emphasizing that "almost 1.5 in 10,000 federal inmates has died due to COVID-19, and there is a 4.42% mortality rate among individuals who have contracted COVID-19 in custody. These numbers are sobering and, on a population proportion bases, somewhat higher than those for the U.S. population.") (internal citations omitted); *United States v. Atkinson*, 2020 WL 1904585, at *3 (D. Nev. Apr. 17, 2020) (noting the "**obvious shortcomings**" in BOP's Action Plan and expressing dissatisfaction with BOP's response to the defendant's application for compassionate release) (emphasis added); *United States v. Esparza*, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (denying motion but describing the Action Plan's "obvious shortcomings": "First,

---

[33] Neff & Blakinger, *supra* note 26.

testing inside prisons has been scant except for people who self-report symptoms—which means that statistics about the number of infections already in BOP facilities are **largely meaningless**. And second, the plan provides no additional protections for high-risk individuals like Esparza.") (emphasis added). Likewise, this Court should not credit the government's argument that the BOP's failing efforts to combat COVID-19 are sufficient to protect Mr. Mattingley.

The criteria the BOP are supposed to consider include the inmate's disciplinary history (he has only two minor infractions on his record), verifiable release plan (he has one), the nature of the crime of conviction (non-violent), whether the inmate has a detainer (he does not), the level of security facility the inmate is in (low), the PATTERN recidivism score (minimum), and the age and vulnerability of the inmate (he is 57 and vulnerable).[34]  Mr. Mattingley meets all of the criteria, and has served more than 50% of his sentence.

## IV.   The § 3553 Factors Support Release

The government argues that the nature and circumstances of Mr. Mattingley's offense weight against release, as well as the fact that he owes $865,452.26 in restitution to eight victims and he has not made meaningful payments during his incarceration.  The remaining concerns have to do with the release plan, already discussed above.

The nature and circumstances of the offense cited by the government are what justified the original sentence in this case.  They do not address why home

---

[34] Memo from Attorney General Barr, March 26, 2020, https://www.justice.gov/file/1262731/download

confinement for the remainder of Mr. Mattingley's sentence with strict conditions of supervised release would not be sufficient given the serious risk posed by Mr. Mattingley remaining at FMC Devens. At this point, assuming he survives the COVID-19 pandemic, he would be released in 18 months. The burden should be on the government to explain why he would be safe to be released into the community in 18 months, but is not now safe to be released into the community on strict home confinement conditions as detailed below. Already, Mr. Mattingley is subject to conditions that will ensure he cannot commit another similar crime as he has to provide the probation office with all financial information, providing full access to his finances, and cannot open lines of credit without permission.

As for the government's concerns over restitution, Mr. Mattingley was taken off his work assignment due to medical issues in December of 2019 due to an episode of atrial fibrillation where he was sent to the Nashoba Valley Medical Center. Since then he has not received clearance to return to work due to his subsequent GI bleeds and leg infection. Even if he is cleared to work again and can work for the next 18 months in the Bureau of Prison at the rate of 12 cents to 40 cents per hour that is available for institution work assignments, he is unlikely to make a noticeable dent in what he owes.[35] At best, if he worked making 40 cents an hour, 40 hours a week for the next 18 months, he would make only $1,296. He has a much better chance of making meaningful restitution payments to the victims of his offense if he is released.

---

[35] https://www.bop.gov/inmates/custody_and_care/work_programs.jsp

## V.   This Court Can Add a Home Confinement Condition to His Supervised Release As Well As a Requirement That He Self-Quarantine for 14 Days

The government's final argument is that this Court cannot force the BOP to place Mr. Mattingely in home confinement.  Mr. Mattingley agrees.  But this Court can change the conditions of his supervised release to include home confinement for the remainder of his sentence –something Mr. Mattingley readily consents to.   That request does not fall outside of the scope of 18 U.S.C. § 3582(c).  Other courts have modified a sentence to home confinement as a form of "compassionate release" under 18 U.S.C. § 3582(c)(1)(A). *See*, *e.g.*, *United States v. Zuckerman*, 1:16-cr-194, dkt #119 (S.D.N.Y. Apr. 3, 2020) (sentence of imprisonment modified to time served with remaining portion of original term to be served as supervised release with condition that defendant be subject to home incarceration without electronic monitoring); *United States v. Atwi*, No. 4:18-cr-20607, dkt #38  (E.D. Mich. Apr. 20, 2020) (sentence reduced to time served and period of supervised release extended by amount of time remaining on custodial sentence, three months, with those months to be served in home confinement without electronic monitoring); *United States v. Sanchez,* No. 3:18-cr-140, 2020 WL 1933815 (D. Conn. Apr. 22, 2020) (granting motion for compassionate release, modifying term of incarceration to time served, increasing period of supervised release, and requiring home detention for first year of that release); *United States v. Williams*, No. 3:04-cr-95, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (reducing sentence to time served and adding as a condition of supervised release that the defendant be subject to one year on home confinement);

*United States v. Burrill*, __ F.Supp.3d ___, No. 17-cr-491, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) (ordering the remaining portion of defendant's original term of imprisonment to be "served as supervised release with the special condition that Burrill shall be subject to home confinement"); *United States v. Early*, No. 1:09-cr-282, dkt #132 (Minute Entry May 5, 2020) (amending conditions of supervised release as part of compassionate release grant to require first six months be on home detention with location monitoring).

The other thing this Court should do is amend his conditions to include a 14-day period of self-quarantine at home, instead of having him be quarantined in the Bureau of Prisons.  As the government admitted today in *United States v. Stevens*, inmates like Mr. Mattingley have been in "effective quarantine" for weeks now in the Bureau of Prisons.  Several judges in this district have now released defendants to self-quarantine at home.  *See, e.g., United States v. Stevens*, 1:08-cr-15 (Order May 6, 2020); *United States v. Tinsley*, No. 3:12-cr-20 (Order April 28, 2020); *United States v. Harper*, No. 7:18-cr-25 (Order April 28, 2020).

## CONCLUSION

Mr. Mattingley respectfully asks the Court to grant this motion.  At the hearing on Friday, May 8, 2020, his wife will testify to allay any further concerns concerning the release and transportation plan set forth herein.

Respectfully Submitted,

Robert Scott Mattingley
By Counsel

18

 /s/ Lisa M. Lorish
LISA MARIE LORISH
Va. Bar No. 81465
Assistant Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA  22902
(434) 220-3380


CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was filed

electronically and will be forwarded to the assigned Assistant United States

Attorney by the ECF system, this the 6th day of May, 2020.

/s Lisa M. Lorish