CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
5/14/2020
JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 6:15-cr-00005 |
| v. | |
| | MEMORANDUM OPINION |
| ROBERT SCOTT MATTINGLEY, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Before the Court is Defendant Robert Scott Mattingley's renewed "Motion for First Step Act – Compassionate Release," in which he requests early termination of his custodial sentence and transfer to home confinement. Dkt. 139. Mattingley states that his increased susceptibility to COVID-19 caused by his various medical issues constitutes an "extraordinary and compelling" reason warranting a sentence reduction under the federal compassionate release statute. The Government opposes any sentence reduction for Mattingley, whether or not it is accompanied by a corresponding term of home confinement.

This Court has previously rejected two motions by Mattingley seeking compassionate release. *See* Dkt. 136, 138. The first, submitted prior to the COVID-19 outbreak in the United States, was rejected because Mattingley had not proven that he exhausted his administrative remedies, and because his medical conditions on their own did not constitute extraordinary and compelling reasons warranting early release from BOP custody. Dkt. 136. His second motion, submitted in mid-April, was rejected because Mattingley had not yet exhausted his administrative remedies. Dkt. 138.

The Court will grant the present motion for compassionate release, because the threat posed by COVID-19, coupled with the heightened susceptibility Mattingley faces because of his age and health, constitute an extraordinary and compelling reason warranting early termination of his custodial sentence. However, in granting Mattingley compassionate release, the Court will also modify Mattingley's term of supervised release to begin upon his release. Mattingley will remain on home conferment for eighteen months—the length of time remaining on his custodial sentence—to be accompanied by appropriate restrictions to curb his ability to repeat the fraudulent and predatory activity that led to his incarceration.

## Background

As detailed in this Court's decision denying Mattingley's first motion for compassionate release, Mattingley was sentenced on November 20, 2017 to fifty months in the custody of the Bureau of Prisons ("BOP") for a series of fraudulent schemes in which Mattingley stole approximately $850,000 from eighty victims over the course of several years. Dkt. 75, 108; *United States v. Mattingley*, No. 6:15-cr-00005, 2020 WL 974874, at *1 (W.D. Va. Feb. 28, 2020). While incarcerated, Mattingley has filed numerous complaints regarding his medical ailments and BOP's alleged inefficiency to care for them. Dkt. 119-5, 126-1, 126-4, 126-5.[1]

Mattingley is a double amputee and requires the use of prosthetics to ambulate. Dkt. 119 at 1. This bilateral amputation of his legs has for years caused chronic phantom pain and a propensity for infection. *Id*. He also suffers from diabetes and hypertension, *Id*.; Dkt. 73-1, which

---

[1] He has also brought numerous actions challenging both the conditions of his incarceration and his underlying conviction. Dkt. 99, 101; *Mattingley v. Coffee, et al*., No. 1:2018-cv-11294 (D. Mass.) (*Bivens* action); *Mattingley v. Spaulding*, No. 1:18-cv-11569 (D. Mass.) (§ 2241 petition); *Mattingley v. Anderson, et al*., No. 1:18-cv-12170 (D. Mass.) (*Bivens* action); *Mattingley v. Spaulding*, No. 1:19-cv-11990 (D. Mass.) (§ 2255 petition); *Mattingley v. Sheriff, et al*., No. 7:19-cv-00638 (W.D. Va.) (§ 1983 action).

2

have been identified by studies offered by Defendant as increasing one's susceptibility to COVID-19.[2]

According to the BOP's website tracking COVID-19 cases throughout BOP facilities, as of May 12, 2020, two staff members and two inmates have been diagnosed with COVID-19; one inmate has died from the virus. In Middlesex County, where FMC Devens is located, there were 17,774 cases confirmed as of May 11, 2020, more than any other county in the state.[3] According to the BOP, Mattingley's projected release date is September 15, 2021. Dkt. 144 at 2.

Mattingley first sought compassionate release on January 17, 2020, which this Court rejected because Mattingley had not demonstrated that 1) he had exhausted his administrative remedies under 18 U.S.C. § 3582(c)(2) and 2) his medical ailments, while serious, impacted his ability to provide self-care while incarcerated, and thus did not fit within the BOP's guidelines of what constitutes an "extraordinary and compelling reason" warranting a sentence reduction. *Mattingley*, 2020 WL 974874, at *1. After the outbreak of COVID-19 in the United States,

---

[2] Zuntou Wu & Jennifer M. McGoogan, Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases From the Chinese Center for Disease Control and Prevention, JAMA (Feb. 24, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762130 (finding elevated case fatality rates in COVID-19 patients with diabetes and hypertension); Ranganath Muniyappa and Sriram Gubbi, COVID-19 pandemic, coronagiruses, and diabetes mellitus, Am. J. Physiology: Endocrinology and Metabolism 318 (Mar. 31, 2020), https://journals.physiology.org/doi/pdf/10.1152/ajpendo.00124.2020 (finding that "[i]ndividuals with diabetes mellitus (DM), hypertension, and severe obesity (BMI 40 kg/m2) are more likely to be infected and are at a higher risk for complications and death from COVID-19") (citations omitted); *see also* Safiya Richardson, *et al.* Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area, JAMA (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184 (finding that of the 5700 patients with COVID-19 studied in New York, those with diabetes were more likely to need invasive intubation).

[3] https://www.boston.com/news/health/2020/03/09/updating-stats-numbers-covid-19-massachusetts.

Mattingley again sought compassionate release. Dkt. 137. However, because Mattingley made the motion prior to requesting that the BOP bring such a motion on his behalf, the Court denied the second motion without prejudice. Dkt. 138. On April 16, Mattingley moved for compassionate release for a third time, on the same grounds as the prior motion. Dkt. 139. On April 29, Mattingley noticed the Court that the Warden at FMC Devens denied his request for compassionate release. Dkt. 141.

## Analysis

Before Congress passed the First Step Act, only BOP could move the Court for compassionate release of an incarcerated defendant for "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i). Under the First Step Act, a defendant now can file a motion for compassionate release on their own behalf, if "the defendant first ask[ed] the BOP to do so and exhaust[ed] administrative appeals following denial of the request." *Mattingley*, 2020 WL 974874, at *2. A defendant who seeks compassionate release under § 3582(c)(1)(A)(i) has the burden of establishing that such relief is warranted. *See, e.g.*, *United States v. Mangarella*, No. 3:06-cr-151, 2020 WL 1291835, at *2 (W.D.N.C. Mar. 16, 2020); *Mattingley*, 2020 WL 974874, at *3.

1. Exhaustion of Administrative Remedies

There is no dispute that Mattingley exhausted his administrative remedies, as § 3582(c)(1)(A) requires. On March 25, 2020, he submitted to the Warden at FMC Devens an Initiation Request for Compassionate Release Based on Medical Circumstances. Dkt 141. On April 24, 2020, Mattingley noticed the Court that his request had been denied. Dkt. 140. The Government does not argue that Defendant failed to exhaust his administrative remedies. Dkt. 144.

4

2.  Extraordinary and Compelling Reasons

A court generally "may not modify a term of imprisonment once it has been imposed."
§ 3582(c). One exception, relevant here, is that the court "may reduce the term of imprisonment"
if the court "finds that extraordinary and compelling reasons warrant such a reduction," after the
Court considers "the factors set forth in section 3553(a) to the extent that they are applicable," and
if "such a reduction is consistent with the applicable policy statements issued by the Sentencing
Commission." § 3582(c)(1)(A). The Sentencing Commission in turn provided that one
circumstance that could establish "extraordinary and compelling reasons" for compassionate
release exist is when the defendant is "suffering from a serious physical or medical condition …
that substantially diminishes the ability of the defendant to provide self-care within the
environment of a correctional facility and from which he or she is not expected to recover." USSG
§ 1B1.13, Comment 1.

Mattingley satisfies USSG § 1B1.13's criteria. In its decision denying Mattingley's first
motion for compassionate release, the Court held that Mattingley's serious physical condition—
being a double amputee—and his corresponding limited ability to self-ambulate did not warrant
relief under USSG § 1B1.13 because this condition did not diminish Mattingley's ability to provide
self-care while incarcerated at FMC Devens. *Mattingley*, 2020 WL 974874, at *5. But
circumstances have changed dramatically since Mattingley's first motion for compassionate
release. At the time of Mattingley's first motion, his ability to provide self-care was not greatly
burdened by his inability to ambulate due to the loss of his legs. Now, this inability to ambulate
poses grave consequences when an inability to move means forced interactions with staff and
greater difficulty to adhere to social distancing guidelines in prison. Mattingley's other medical
conditions make this inability to ensure his own health and safety all the more dire. Heart

5

conditions like Mattingley's hypertension as well as diabetes are both identified by health experts as increasing one's susceptibility to COVID-19. *See supra* at 2. Simply put, Mattingley's physical condition limits his ability to care for his health and safety in a correctional facility environment faced with the global COVID-19 pandemic, and this inability poses a grave threat to Mattingley's life. The Government does not dispute the fact that Mattingley's health conditions put him at high risk should he contract the virus. Dkt. 144 at 9.

The Government "acknowledges that COVID-19 may affect whether Mattingley can show an 'extraordinary and compelling reason' warranting compassionate release," but posits that this is true only true to the extent that Mattingley "is more likely to contract COVID-19 in his particular institution than if released." Dkt. 144 at 9. To this end, the Government argues that "[a]lthough Mattingley may be high-risk, FMC Devens has taken many precautions and has only seen on case of COVID-19, which they have been able to contain, and has not spread to any other inmates or staff." *Id.* Further, given FMC Devens's near absence of COVID-19 cases and its purported ability to provide Mattingley with "much" of his medical treatment onsite, the Government argues that he will be less likely to contract COVID-19 at FMC Devens than he would be on home confinement, where he would presumably have to leave the home to receive medical treatment. *Id.*

There are several reasons to doubt Mattingley's relative safety at FMC Devens compared to home confinement in Lynchburg, Virginia. First, the situation at FMC Devens, like every federal penitentiary in the present environment, is rapidly evolving. When the parties held argument on this motion on Friday, May 8, 2020, only one FMC Devens inmate had contracted and succumbed to COVID-19. Today, two staff members and an additional inmate have contracted the virus.[4] As

---

[4] Bureau of Prisons, COVID-19 Coronavirus (last visited May 13, 2020), available at https://www.bop.gov/coronavirus/.

Defendant argues, such case numbers have quickly ballooned at other federal facilities.[5] While such occurrences elsewhere by no means guarantee that the same will occur at FMC Devens, the odds of such an occurrence are surely increased by the outbreak currently seen in Middlesex County, where FMC Devens sits.[6] Middlesex County is home to the largest outbreak of COVID-19 cases in the state, with 17,953 cases reported as of May 12, 2020, up from 15,980 on May 6, 2020, the day of Defendant's last briefing on the motion. Dkt. 147 at 7. Even if FMC Devens successfully prevents any more of its inmates or staff from contracting COVID-19 within the facility, the Government makes no assertion that all of Defendant's medical care could be provided without the occasional transfer to a medical facility within Middlesex County,[7] which is experiencing a far greater outbreak than Lynchburg, Virginia, which has currently reported just 70

---

[5] For example, on April 1, 2020, FCI Butner reported twelve cases among its inmates and staff. The News & Observer, *Two more cases of COVID-19 reported at Butner Federal Prison in North Carolina*, April 1, 2020, available at https://www.newsobserver.com/news/coronavirus/article241692281.html. By April 6, 2020, that number increased to 59 people testing positive. The News & Observer, Coronavirus cases surge at Butner prison complex in NC, county official reports, April 6, 2020, available at available at https://www.newsobserver.com/news/coronavirus/article241801076.html. Likewise at FMC Forth Worth, 131 inmates tested positive with the virus within fifteen days of the first diagnosis. Fort Worth Star-Telegram, Inmates, families fear worst for Fort Worth federal prison 'consumed' by coronavirus, May 11, 2020, available at https://www.star-telegram.com/news/coronavirus/article242639261.html.

[6] Neither can the Court ignore evidence tending to show that testing may be insufficient in many BOP facilities, either to provide an accurate representation of current cases or to ensure inmate safety in the event of an outbreak. Walter Pavlo, Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison, Forbes (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisonsunderreporting-outbreaks-in-prison/#719057947ba3; Cary Aspinwall & Joseph Neff, These Prisons Are Doing Mass testing for COVID-19—And Finding Mass Infections, The Marshall Project (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/theseprisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections.

[7] Indeed, Mattingley has been hospitalized five times during his time in custody at FMC Devens for various medical issues. *See Mattingley*, 2020 WL 974874, at *1–2.

positive COVID-19 cases.[8] Thus, even without a current outbreak at FMC Devens, the Court cannot accept the Government's assertion that Mattingley would run a lower risk of contracting COVID-19 at FMC Devens than at his home in Lynchburg, Virginia.

Thus, the Court finds that Mattingley has demonstrated that extraordinary and compelling reasons counsel in favor of a sentencing reduction.

### 3. Section 3553(a) factors

Even if the Court finds that extraordinary and compelling reasons warrant a sentencing reduction, it must still "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The Government contends that these counsel against release both because of the nature and circumstances of his offense as well as the outstanding amount of restitution owed by Mattingley to his victims.

First, regarding the $865,452.26 Mattingley owes to eighty victims, nothing in the Court's decision today lessens this obligation. The Government argues that the "great need to provide extensive restitution to numerous victims weighs heavily against Mattingley's release." Dkt. 144 at 12. The Court agrees with the importance of Mattingley's duty to make restitution and to undo some of the harm wrought upon his victims. However, even assuming that continuing Mattingley's incarceration would motivate quicker payment of his restitution owed, here that would not counsel strongly in favor of keeping incarcerated since he would only be making forty cents per hour working at FMC Devens, and he represents he has been unable to work on account of his health conditions.

---

[8] Virginia Department of Health, COVID-19 in Virginia (last visited: May 12, 2020), available at https://www.vdh.virginia.gov/coronavirus/.

With respect to the nature and circumstances of the offense, the Government is indeed correct that "Mattingley stole large amounts of money from many people," and that "[h]e continued his fraudulent scheme during the pendency of his criminal case until he was incarcerated." Dkt. 144 at 11. As several of his many victims recounted at both his sentencing and at oral argument on the present motion, Mattingley did severe and lasting damage to the lives of many and showed little remorse for it. That being said, the Court must nevertheless balance the culpability of Mattingley's conduct against the serious risk of serious illness or death he faces at FMC Devens. Had the Court known when it sentenced Mattingley in 2017 that the final eighteen months of his term in a federal prison would expose him to a heightened and substantial health risk presented by the COVID-19 pandemic on account of his medical conditions and compromised ability to socially distance, the Court would not have sentenced him to the latter 18 months. Given the corresponding amendment to Mattingley's supervised release term, the Court further finds that the length of Defendant's incarceration to date adequately expresses the seriousness of the offenses, promote respect for the law, deters criminal conduct, and protects the public under § 3553(a). The Court also finds significant the fact that Defendant's offense was a nonviolent one, and that any threat Mattingley poses to the community will be significantly mitigated by the conditions the Court will impose on Mattingley's term of supervised release.

**Home Confinement Plan**

When a court reduces a sentence pursuant to 18 U.S.C. § 2582(c)(1)(A), it also "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." In moving for compassionate release, Mattingley asks that he be allowed to serve the remaining eighteen months of his sentence on home confinement in Lynchburg, Virginia, where his wife and two children reside. Dkt. 137 at 8. At the

May 8, 2020 hearing on this motion, Patty Mattingley, the Defendant's wife, represented that she would transport Mattingley from FMC Devens to their home in Lynchburg, Virginia. Dkt. 148. Mrs. Mattingley has stated that she will oversee his medical care, with assistance from their two adult children. *Id.*

The Court is mindful of the Government's concern that Mattingley, if given the opportunity, may resume his fraudulent and predatory schemes. On May 8, 2020, the Court asked the parties what special conditions it could impose as part of Mattingley's home confinement that would mitigate Mattingley's ability to engage in such activity. Dkt. 149. After considering the submissions of the parties, the Court in an accompanying order will impose the following Special Conditions of Supervised Release:

1. The defendant shall participate in home detention and is restricted to his residence at all times, except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the probation officer;

2. The defendant shall be monitored by voice recognition until September 15, 2021, and shall abide by all technology requirements. The participant shall pay all of the costs of participation in the location monitoring program as directed by the court and supervising officer. Voice recognition technology requires that a landline telephone be installed and maintained at the defendant's residence at the defendant's expense. This form of location monitoring technology shall be used to monitor defendant's compliance with home detention as well as other court-imposed conditions of release;

3. The defendant must not engage in any occupation, business, profession, or volunteer activity without the prior approval of the probation officer;

4. The defendant shall not incorporate or register any business entity without prior approval from the probation officer;

5. The defendant must immediately disclose to the probation officer all computer device(s), cellular telephone(s), or Internet-capable devices to which the defendant has access. The defendant may only use specific computer devices, specific cellular telephones, and/or specific Internet-capable devices which have been pre-approved by the probation officer;

6. The defendant shall allow the probation officer to monitor his computer activities at any time, with or without suspicion that he has violated the conditions of his supervision, in the lawful discharge of the officer's duties. The defendant shall allow the probation officer to seize his devices and storage media for further analysis by law enforcement or the probation office, if the probation officer has reasonable suspicion that the defendant has or is about to engage in unlawful conduct or violate a condition of supervision. To this end, the defendant shall participate in the Computer Monitoring Program adopted by this court and comply with all of the conditions in the Program's Participant Agreement. The defendant must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) used by the defendant. The defendant shall allow monitoring software/hardware to be installed on each computer, electronic communication device, or other Internet-capable device the defendant has access to at the defendant's expense; and

7. The defendant shall submit his person, property, house, residence, vehicle, papers, computers as defined in 18 U.S.C. § I 030(e)(1), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant-shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. This may include the retrieval and copying of all data.

### Conclusion

Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Court finds that extraordinary and compelling circumstances warrant a reduction in Mattingley's sentence; that Mattingley does not pose a danger to any other person or the community; that the § 3553(a) factors support a reduction in sentence; and that the reduction is consistent with applicable Sentencing Commission Policy Statements, *see* U.S.S.G. § 1B1.13.

The Court therefore will grant Mattingley's Motion for Compassionate Release, Dkt. 139, and order that Mattingley be released, subject to his completion of a 14-day quarantine period as set forth in Attorney General Barr's March 26, 2020 memorandum to BOP.

Entered this ___14th___ day of May, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE